Statement of the Case.
MONROE, J.
The receiver of the above-entitled company filed an account, showing: Cash on hand, $5,246.59; debts and charges, $2,036.27; balance for distribution among stockholders, $3,210.82.
R. W. Wilmot, a stockholder, the Louisiana National Bank, and the Canal Bank & Trust Company (each of the banks through liquidators), claiming as creditors, opposed the items appearing as debts and charges, on the ground that they are unauthorized and excessive; but there is no' complaint, here, of the judgment appealed from, in so far as it affects that side of the account, save that Wilmot, who has paid his stock subscription in full, opposes any distribution of the fund on hand, until the other stockholders shall have been compelled to make like payments. And the main questions to be decided are, whether the two banks shall be recognized as ordinary creditors, and whether the receiver shall be held responsible for the balances due on the stock, or shall be ordered to proceed against the stockholders for their collection.
The district court gave judgment in favor of the banks, on their claims, and ordered the receiver to proceed against the stockholders for the unpaid balances, and also directed that the fund on hand be distributed. The receiver and Wilmot have appealed.
The company in question was incorporated, in this city, in August, 1902, for the declared purpose of buying, leasing, operating, and selling mineral springs and hotels, with a nominal capital of $100,000, and a board of seven directors, to wit, Henry Mordecai, his brother, and his son, R. E. L. Golds-borough, E. S. Maunsell, and John E. Hollingsworth ; Henry Mordecai being named president, Hollingsworth, treasurer and secretary. No money was paid at the time, but Henry Mordecai subsequently transferred to the company a lease of certain property in Mississippi, upon which there are said to be mineral springs, for which he received 667 (out of a total of 1,000) shares of stock, as full paid and nonassessable. Of the 667 shares thus issued to him, he transferred 15 shares to Maunsell, and the other parties mentioned were provided with a few shares, each, either from the same source or from what was called the “treasury" stock (being that which had not been transferred to Mordecai), but, so far ás we can gather from the record, neither of them paid any money.
Thereafter Mordecai employed a broker to sell the -stock, have it listed in the stock exchange, and “boom” it, which he did; those to whom he sold paying, generally, $20 a share, and he receiving 13 shares of the “treasury” stock (as full paid) for his services. In May, 1903, the different holders signed an agreement not to offer any of their stock for sale (save among themselves) before November 1st, and in August they signed another agreement, consisting of a written proposition, by Goldsborough, and acceptance by them, reading, in part, as follows:
“I am willing to take 680 shares of the stock of the Vossburg * * * Company, Limited, at $83.33% a share, * * * on the following terms and conditions, to wit: (Here follows a list of names of stockholders with the shares held by them and included in the contract, which list also includes 125 ‘treasury’ shares.) All this stock is to be paid for by me on the first day of May, 1904, except the ‘treasury’ stock of the company, 125 shares, which is to be paid for on the first day of March, 1904. * '■* * I am to furnish a bond, to each seller *369 of stock, by a responsible surety company. * * * It is understood that a brokerage of 5% per cent, is to be paid on all the stock bought by me, including the treasury stock. *' * * it is also understood that a dividend of 5% per cent, is to be declared by the board of directors and paid out of the proceeds of the sale of the treasury stock, and the same is to be (paid) to me as purchaser. The amount that will be remaining in the treasury, after the payment of the dividends and brokerage herein provided for, will be about $4,344.07. It is understood, of course, that those not selling out entirely will have the same dividend on any unsold stock, that is, 5% per cent., same - as I got it.”
There was a separate and similar agreement between Goldsborough and Mordecai, with reference to 50 additional shares of stock belonging to the latter, to which agreement the guaranty of a surety company was attached, and to which was added the stipulation that the stock (certificate) should also be attached; and we infer that thereafter Goldsborough gave his notes, or bonds (guaranteed as agreed), to the different shareholders, and that they, together with the certificates representing the stock of such holders, were deposited in escrow in one or more of the banks, such deposits having, at all events, been made in the Provident Bank. In the meanwhile, the broker employed by Mordecai made offers, at intervals, on the floor of the Stock Exchange, to buy the stock, and the quotations, taken in connection with the guaranteed contracts, deposited in the banks, gave the stock a certain value with those institutions, as a marketable collateral. Precisely at what date the company (meaning the Vossburg, etc., Company) opened accounts with the two banks now before the court the record does not enable us to say.
The liquidators of the Louisiana National Bank allege that, as such, they are creditors in the sum of $6,826.21.
“Balances due by the * * * company • * * on general banking account, as more fully shown, in detail, in the itemized statement attached to the petition of plaintiff in the suit entitled the Louisiana National Bank v. Thomas J. Henderson et al., No. 74,440 on the docket, * * * consolidated, by order of court, with the receivership proceeding, which statement * * * is made part of this petition. Opponents further aver that said balance, as shown upon said statement, is, as to the principal, made up of one promissory note, and the several drafts described in said statement, * * * said drafts having been discounted, or cashed, by and for the account of said Vossburg * * * Company, Ltd., and the proceeds thereof passed to the credit of said company, and, in due course, drawn by it, all of which, note and drafts, were dishonored at maturity and are held and possessed by opponents, as liquidators aforesaid. * * * Opponents show that, if the said Vossburg * * * Company, Ltd., is not indebted to them * * * upon and for a balance * * * upon general banking account, it is indebted * * * upon said promissory note and drafts, all dishonored for the faces thereof and interest, and for costs of protests; and, in the alternative, opponents hereby proceed and sue, and base their demand, upon said note and drafts. * * * Wherefore opponents pray that ' this their opposition •s * .* be maintained, and that the account * * * be amended so as to set forth, with full details, the names of all delinquent stqckholders, * * * so as to charge said receiver with the aggregate of said delinquent subscriptions, say,_ $12,000, and ordering him, if the court declines to order him charged with said amount, to sue, without delay, all defaulting shareholders who do not, at once, satisfy their indebtedness. * * * Opponents also _ pray that they be placed * * * upon said account, for and in behalf of the Louisiana National Bank, as creditors, in the full sum of $6,826.21, with interest as claimed above.
Upon the statement thus referred to and made part of the opposition, the Vossburg Company is charged with a note and certain drafts, together with interest and protest fees; the whole (a few small items of credit deducted) aggregating the amount here claimed. The instruments mentioned may be described as follows:
One note, for $2,000, dated April 16, 1904, signed “Vossburg Mineral Springs Co., Ltd., Henry Mordecai, President,” made payable 60 days after date, with interest at 8 per cent, per annum, from maturity, to the order of the Louisiana National Bank, and bearing the indorsement, “Secured by pledge of 40 shares of the Vossburg Mineral Springs Co., Ltd., stock.” Ten drafts, for amounts between $415 and $600, drawn by “Henry Mor-
*371 -decaí, Prest.,” to the order of “Vossburg Mineral Springs Co., Ltd.,” and indorsed, in blank, “Vossburg Mineral Springs Co., Ltd., Henry Mordecai, Prest.,” all purporting to have shares of “Vossburg” stock attached, all save one dated at New Orleans, all save two accepted by the drawees, two showing that they were protested for nonacceptance ■and nonpayment, and one showing that it was protested for nonpayment after acceptance. The dates, amounts, and maturities of these drafts are as follows:
April 22, 1904. $455. June 22, 1904.
455. “ 27, ..... 30, “
480. July “ 30, 15, “
2, May 2, “ 500. 20, “
9, 585. 10, “
21, 420. 30, “
June 7, 420. 15 days sight (June 22)
4, 415. August 1Ó, 1904.
8, 600. “ 20, “
10, 540. “ 30, “
The liquidators of the Canal Bank & Trust ■Company (successors to the Provident Bank & Trust Company) have placed their opposition upon the same basis. They sue for a balance of account, which they allege is made up, as to the principal, of the amounts represented by one promissory note and ten drafts, all of which were “discounted or ■cashed by, or for the account of, the said Vossburg Mineral Springs Company, Ltd., and the proceeds passed to the credit of said ■company, and, in due course, drawn by it; all •of which, note and drafts, were dishonored .at maturity and are held and possessed by opponents, as liquidators. Opponents show that, if the said Vossburg * * * Company, Ltd., is not indebted to them, as liquidators aforesaid, upon and for the balance against said company, upon a general banking account! it is indebted * * * upon ■said promissory note and said drafts, * * * and, in the alternative, * * * they pray for judgment, as do the other liquidators.”
The instruments referred to may be thus described:
A note for $800; dated August 8, 1903; signed, “Vossburg Mineral Springs Co., Ltd., Henry Mordecai, President”; and made payable, on demand, with interest at 6 per cent, from date, to the order of the Provident Bank & Trust Company.
Ten drafts, for amounts between $374 and $666, all of which are made payable to the order of “The Vossburg Mineral Springs Co., Ltd.,” and bear the indorsement, “Vossburg Mineral Springs Company, Ltd., Henry Mordecai, Prest.” Eight of the drafts are signed, “Henry Mordecai, President,” or “Henry Mordecai, Prest.”; two of them are signed, “Henry Mordecai.” The note shows no indication of having been secured by collateral. Nine of the drafts recite, on their faces, the attachment of Vossburg Company stock. The other (being the draft dated January 4, 1903, for $578) contains no such recital. The dates, amounts, and maturities of the drafts are as follows:
Jany. 4, 1903. $578. 60 days sight.
1904. 575 “ “ “
“ 25, 659Í98. March 25, 1904.
29, 670. “ 30, “
Feb. 1, 573. April 10, “
5, 574. “ 15, “
9, 665. “ 20, “
10, 576. “ 25, “
12, 664. “ 30, “
17, 666. May 15, “
Mr. John F. Couret, who was cashier of the Louisiana National Bank at the time of the transactions in question, being asked if he had made any investigation to find out whether Mr. Mordecai had any authority to make the note for $2,000, replied:
“I didn’t investigate, but I took it for granted, or I asked him for a copy of the resolution of the board, which he afterwards gave me.”
The resolution referred to is not identified and. may have been one adopted at the first meeting of the board, September 12, 1902, to the effect that:
“The president be and he is hereby clothed with power to take such steps as are deemed necessary and proper for the conduct of the business and the management of its (the company’s) affairs.”
*373 Or it may have been one adopted March 1, 1904, purporting to hold the president of the company harmless against loss on ac■count of the pledging of his stock for money borrowed, and which declares:
“That the action of the president in providing funds as hereinabove set forth for the business •of the company * * * be and the same are hereby ratified and confirmed in every particular.”
Or it may have been one adopted at a later date, and which, with the preamble ■(taking it as we find it in the transcript, the minute book not being within reach), reads, in part, as follows:
“Whereas, by resolution, the board of directors, at a regular meeting of the board on the first day of March last, provided for the compensation of Henry Mordecai for services rendered in raising money for the use of the company and benefit of the business, as set forth in said resolution; and, whereas, for the security and protection of said Mordecai against loss in pledging his stock and borrowing money and thereby jeopardizing the same, a note of R. E. L. Goldsborough, for $5,280.83, with a receipt from the Provident Bank & Trust Company, •showing that they held 62% shares of Vossburg Mineral Springs stock to secure the payment of said note, was transferred to said Mordecai; and, whereas, said Mordecai had to use said note with the Provident Bank & Trust Company as additional security for the protection of the company’s interest, thereby parting with the security he held for his own protection; and, whereas, since the first day of March, said Mordecai has had to borrow money for the company, one time as much as $20,000 and, in so doing had to use his own stock (as the company had none available), so that he has pledged (to secure) such loans 186 shares of his own stock, and, in addition, has 100 shares in escrow, in the hands of the Provident Bank & Trust Company, which may, in some way, be held and appropriated for the payment of the indebtedness of the company; and, whereas, we recognize the value of the services thus rendered the company by said Mordecai and appreciate the risk he has taken and is still taking and feel that he should be compensated and protected in the prooable loss of his stock, of 186 shares: Resolved that, in lieu of the note of said Goldsborough of $5,280.83, said Mordecai be allowed, as commission, and for the protection against loss of his stock, the sum of $4,000, same to be credited on his account, with the understanding that if, hereafter, the indebtedness of the company is paid and his stock released, he is to refund the amount now allowed him. * * * ”
It seems probable that most of the stock pledged to the two banks was the property of Mr. Mordecai. 'On the other hand, whilst the money which was thereby obtained was credited to the accounts of the company, it was drawn out of the banks on checks which were payable to the order of Mordecai, and he has fallen considerably short in his attempt to show that it was all used for the benefit of the company; nor, were the experts, who made some examination of the books of the company, able to discover from them that such was the case.
Mr. Young, who was president of the Provident Bank & Trust Company, appears to have been influenced to discount the note of $800 by the fact that the Yossburg Company stock was listed and quoted on the Stock Exchange, and because it was within his knowledge that certain of the stockholders of the company, including Mr. T. J. Henderson, who was a director in the Provident 'Bank, and also director and vice president of the Yossburg Company, had, as it was supposed, sold their stock in said company at 83.33%.
As t'o the drafts: They seem to have been taken in both banks upon the faith of the collateral which was attached to them, rather than upon the credit of the party who presented them for discount'. It is conceded that the operations in connection with them constituted what is called “kiting”; Mr. Mordecai testifying upon the subject as follows:
“Q. In other words, Mr. Mordecai, did your company do, in connection with these drafts, anything like a kiting business? A. Yes, sir; it was entirely a kiting line. By the Court: Will you please explain what a kiting line is? I don’t understand that. * * * A. Well, we put those drafts in bank, and, just before they were due, we put in another draft and got the money on it and remitted by wire, to take the other draft up, and kept doing that in order to keep the business afloat until the maturity of the notes. (Referring, as we understand it, to the notes given by Goldsborough for the purchase of the stock, which purchase was not thereafter consummated.)”
*375 If is proper to say, here, that Mr. Young testifies that, when he realized that Mr. Mordeeai was engaged in kiting, he put a stop to the business; and it may, also, be remarked that the testimony makes it perfectly clear that not only was there no' expectation on the part of the drawer of the drafts in question that they would be paid by the drawees, but it was well understood that the drawees should be under no responsibility in the matter, and that the drafts would be taken care of by the drawer.
On July 18, 1904, the board of directors of the Yossburg Company adopted a resolution declaring that the company was insolvent, and that a receiver should be appointed, and, a few days later, on the application of W. R. Taylor, who was a creditor, and who was joined by W. L. Saxon, then president of the company, vice Mordecai, resigned, the receiver was appointed. In October, following, the two banks (opponents herein) brought suits upon the claims here asserted against a certain number of the stockholders of the company, alleging that they were liable for said claims, as commercial partners, in solido. The suits were dismissed in the district court on exceptions of no cause of action; but the judgments so rendered were reversed by this court, and the cases remanded. Provident Bank & Trust Co. v. Saxon et al., 116 La. 408, 40 South. 778; Louisiana National Bank v. Henderson et al., 116 La. 413, 40 South. 779. Upon their return to the district court, the casek were consolidated, and again the court decided adversely to the plaintiffs, and the judgment was affirmed by this court. Louisiana National Bank v. Henderson, 123 La. 243, 48 South. 922.
Opinion.
The appellants (the receiver and Mr. Wilmot) assert that the judgment of the district court should be reversed in so far as it recognizes the liquidators of the banks as creditors of the Yossburg Company.
The grounds relied on are: (1) That the debts were incurred by Mordecai without authority from the company, and for his own benefit; (2) that the claims of the opponents, as based on open accounts, are barred by the prescription of three years; and, as based on notes and bills, by the prescription of five years; (3) that the company is released, in any event, as indorser of the bills, by the failure of the holder to protest said bills and notify it of their dishonor.
1. The charter of the company provides:
“Art. 4. The affairs of this corporation shall be managed by a board of seven directors; * * * a majority of the board of directors shall constitute a quorum; * * * they shall make, change, modify and alter all - by-laws, rules and regulations for the management of the business * * * as they may think proper ; purchase, lease, sell, sublease, mortgage and pledge property, real, personal and mixed; make and sign notes, bonds and contracts, and, generally, do any and all such matters and things as are necessary and proper for the successful management of the business of the corporation. * * * ”
The board, in March, 1903, adopted bylaws, and, among them, the following (bylaw 19):
“The president shall be the chief executive of the company; he shall preside at all meetings of the stockholders and directors; he shall have general and active management of the business of the company; he shall, also, sign, in behalf of the company, bills, notes, receipts, acceptances, indorsements, checks, releases, contracts, and other documents, as may be required for the proper and effective management of the affairs of the company.”
[1] The general rule upon the subject of the authority of the president of a corporation is stated as follows:
“According to the decided weight of authority, whether he (the president of a corporation) has authority to do a particular act depends upon the power conferred upon him, either by the charter or by the stockholders or directors. * * * The mere fact that he is president, without more, does not imply that he has any greater power than any other director.” Marshall on Corporations, p. 953 (quoted as authority in Jackson Brewing Co. v. Canton, 118 La. 823, 43 South. 454); Cook on Stock & Stockholders & Corporation Law (Ed. 18891 § 716; Taylor on Private Corporation (3d Ed.) page 197.
*377 [2] Conceding that the board of directors of a corporation cannot, in the exercise of the power conferred by the charter to make by-laws, abdicate its functions, and vest in the president, as the charter vests in it, all the powers of the corporation, it may, nevertheless, vest in him a wide discretion and authority with respect to the ordinary business of the corporation, and may constitute him the executive officer of the corporation and authorize him, as such, to represent the corporation in the negotiation and signing of contracts which it (the board) has approved; and, where such action has been taken without previous authorization, may ratify and confirm the same.
[3] The by-law which we have quoted, it is true, may be construed as conferring upon the president, not only the power to sign such instruments as the board may approve, but as conferring plenary authority to determine what contracts he shall sign. The grant must, however, be construed with reference to the charter and the law, and, so construed, limits the power conferred to contracts which have been approved by the board, or which come within the most ordinary course of the business of the corporation. As appears, however, from the statement heretofore made, the board of directors of the Vossburg Company was apprized, as early as March 1, 1904, that the president, exercising the authority conferred on him by the by-law, and by the board’s resolution of September 12, 1902, clothing him with the power “to take such steps as are deemed necessary and proper for the conduct of the business,” etc., had been borrowing money in the name of the corporation, and it adopted a resolution ratifying and confirming his action, in every particular, which ratification was repeated, at a subsequent date, when a resolution was adopted in which it is stated that the amount borrowed was as much as $20,000. We are therefore of opinion that, whilst the stockholders may have reason to complain that the directors, selected or retained by them, failed to discharge the duty of informing themselves of the details of the transactions in which the president, by their authority, was involving the company, and of the disposition that he was making of the corporate funds, there was no lack, as between the company and those who furnished the money, of authority in the president to obtain it, and, as those who furnished it did so in good faith, the contracts under which it was furnished must be regarded as the contracts of the company, and the disposition which was made of the money, after it was placed to the credit of the company’s accounts, is a matter with which those by whom it was so placed have no concern.
[4] It seems clear to us, however, that the opponents have no right of action upon what they call the “general banking accounts.” The Provident Bank, we will say, made a contract with the company whereby it loaned it $800, and the contract was evidenced by a written instrument, known, in legal terminology, as a negotiable promissory note, its rights with respect to which are governed by specific and well-understood rules. If, having parted with its money, it had found that the note had been executed by one not authorized for that purpose, it would have had the right to sue upon another, and implied, contract; but that is not the case here, since we have concluded that the contract evidenced by the note was authorized, from which it follows that it is the only contract upon which the bank can rely. The money with which the bank parted in exchange for the note became the absolute property of the company, and, having been placed to the credit of its account, the company had the right to draw it out by checks, and is not liable to any one for having done so. Nor do we find that the drafts present a different case. They might have been received merely for collection, for account of the company, and the bank might have made a charge for *379 its services in effecting the collection, and might have allowed the company to draw the proceeds in anticipation of the collection, or, in other words, might have made a loan to the company with the understanding that it would reimburse itsélf from the proceeds of the collection. But that is not what was done, as we understand it. The bank took the drafts at a value fixed by itself; that is to say, it deducted from the amounts called for on the faces of the drafts the difference between the value of those amounts, here in New Orleans, at that time, and their value, to it, at the places where and dates at which the drafts were to be paid and gave the company the balance. In other words, they deducted the amount of the discount and the exchange, paid the balance to the company, as the price of the drafts, and kept the drafts as their own property.
The method of dealing was the same in both banks, and is shown by the following testimony of the cashier of the Louisiana National Bank, to wit:
“Q. So, if I understand correctly, when these several drafts were presented to the bank, the bank credited the Vossburg Mineral Springs Company’s account with the face of the draft-less, what? A. Less the discount and exchange.”
At another place, referring to the draft (using the word generically), counsel propounded the question:
“I simply wanted to know how you regarded it. You regard it as the property of the bank?”
And the answer was:
“Undoubtedly.”
[5] It is objected, as to the drafts, that they were not protested, or, if protested, that the company was not notified. But, as we have found, the drafts were drawn by, and for, the company, with the understanding, as between it and the drawees, that the drawees were not to pay them, and that they would be taken care of by the company. The company was therefore not entitled to notice of protest. The receiver and Mr. Wilmot, finally, rely on the prescription of five years, and the plea is, in the main, go'od, unless the-prescription has been interrupted, as the oppositions were not filed until August 9, 1909 ; whereas, with the exception of three of the drafts, held by the Louisiana National Bank, all the paper sued on matured, prior to that date, in 1904. Opponents rely, for the interruption of the prescription, upon: (1) A rule taken by the receiver to consolidate the two suits, which the banks had brought against the stockholders, with the receivership proceeding ; and (2) upon the pendency of the receivership; (3) upon the banks’ continued possession of the collateral, pledged, or “attached,” to secure the notes or drafts. The first ground appears to us to be entirely without merit. The banks assumed the position that the members of the Vossburg Company were commercial partners and brought suits against them, individually, as such. The suits (Provident Bank & Trust Co. v. Walter L. Saxon et al., and Louisiana National Bank v. Thomas J. Henderson et al.) were, as we have heretofore stated, dismissed by the district court, on exceptions of no-cause of action; but on appeal those judgments were reversed, and the cases were remanded for trial on the merits. It appears that one of them was in division A of the-court, and the other in division C., and that the receivership was in division B. In that situation a motion was filed, in division B,. reading, in part, as follows :
“On motion of Lyle Saxon, atty. for George S. Smith, * * * receiver, * * * and as attorney for Walter L. Saxon, Edward Aaron, Claude Smith, and Col. Peter Pescud, part of the defendants in the matter of the Provident Bank & Trust Company v. Walter L. Saxon et al., * * * and, on suggesting * * * that the * * * judge of division A * * * has upon motion of your mover, referred the case-of the Provident Bank * * * to division B, to be consolidated and tried with the receivership proceedings. * * * And * * * that the * * * judge of division C has referred the matter of the Louisiana National Bank v. Thomas J. Henderson et al. * -* * to division B, for your honor * * * to hear and. *381 determine. * * * And, on further suggesting that it is to the best interest of all parties concerned, both plaintiffs and defendants in the aforesaid cases, that same be heard and determined together, and one judgment be entered, as to whether the members of the aforesaid Vossburg Mineral Springs Company are liable as partners or stockholders for the debts of the same, and that the receiver * * * be authorized to collect the assets of said company and liquidate its affairs, according as the court may order. And on further suggesting * * * that there are numerous exceptions on file in the aforesaid eases, and that it is the desire of mover that same be fixed for trial, and the plaintiffs and defendants herein duly notified, * * * it is ordered that 'the Louisiana National Bank and the Provident Bank & Trust Company be duly notified, through their proper officers, and Thomas J. Henderson, James B. Sinnott, John IT. Kalmade, Robert W. Wilmot, Henry A. Testard, Charles N. Duley, Edward J. Maunsell, and Luther Sexton be duly notified hereof, and that the exceptions will be taken up and tried on Friday, the 17th day of March, 1904.”
As the rule was filed on March 13, 1905, it is evident that the figure 4, as given above, is an error of transcription.
On April 24, 1905, the Provident Bank filed an exception to the rule thus taken, as follows :
“The Provident Bank * * * pleads that the movers have no right to intermingle the case of the Provident Bank & Trust Company v. Walter L. Saxon et al. with the receivership proceedings; * * * that the suit of the Provident Bank & Trust Company is against certain alleged stockholders, claimed by the bank to be members of a commercial partnership ; that neither the alleged corporation nor the receiver is made defendant in the suit of the Provident Bank; that the receiver, representing the Vossburg * » * Company, has no legal interest in the question of the liability, personally and in solido, of the various stockholders ; that the order rendered by the Honorable T. C. W. Ellis, ordering the consolidation of the case of the Provident Bank & Trust Company v. Walter L. Saxon et al., with said receivership proceedings, was rendered without jurisdiction or authority of any sort, the order transferring to division B divesting him of further right or authority or jurisdiction of the case; * * * that, even if the said Judge Ellis had jurisdiction to render such order, it was improvidently made and should be rescinded by this honorable court. Appearer prays that this rule, in so far as it looks to the consolidation and fusing of the case of the Provident Bank & Trust Company against W. L. Saxon et al. with the receivership proceedings, be discharged, and that this court, exercising its right and jurisdiction in the matter,, cancel and rescind the said order of consolidation by the said Honorable T. C. W. Ellis, and that it now order the cause of the Provident Bank & Trust Company against W. L. Saxon et al. to be proceeded with to trial and final determination, as a separate and independent cause, and not consolidated with the said receivership proceedings,” etc.
What the Louisiana National Bank did in the premises does not appear, nor does it,, definitely, appear what action the court took; but we infer that the exception of the Provident Bank was maintained, as, although the suits of the two banks against the stockholders appear to have been consolidated and tried as one, the receiver was rigidly excluded.
[6] As the matter stands, therefore, it appears that, although the receiver made an, offer to submit to the court, in one and the same suit, the question whether the banks had claims against the company or the stockholders, the banks declined the offer, and, in effect, repudiated the idea that they were asserting any claim against the company, or that the receiver had any interest in the claim that they were asserting against the persons whom they alleged were indebted to ■them as commercial partners. Such a course of conduct could not be construed as a demand upon the company, or the receiver, and hence could not operate to interrupt the prescription here pleaded.
[7] Upon the question whether the appointment of a receiver to a corporation serves, of itself, to interrupt the prescription of a claim against the corporation, we are compelled to say that we do not find any law to that effect. A prescription, .established by law, against a claim of a particular character, runs against all persons, unless they are included in some exception, established by law, no matter who may be the debtor. O. O. art. 3521. In cases of insolvency, the law especially provides that (R. S. art. 1790):
“When issuing the order for the meeting of creditors, the judge shall order that all pro *383 ceedings, as well against the person as against the property of the debtor, be stayed.”
And that (R. S. art. 1791):
‘■‘Erom and after such cession and acceptance, all the property of the insolvent debtor mentioned in the schedule shall be vested in his creditors.”
It is clear, therefore, that in such case the running of prescription is suspended, since to prohibit one from making a judicial demand, and at the same time destroy his right because of his failure to do so, would be to deprive him of his property without due process of law; and, moreover, no prescription can run against one who is continually acknowledging the debt, and the law acknowledges the debts of the insolvent by vesting his property in his creditors. But (and it is conceded), though the property of the debtor be wrested from his possession, by death, and go into the possession of an officér appointed by the court, and though such officer may be said to hold it as the common pledge of the creditors, the running of the prescription against the decedent is not thereby suspended ; and the reason is that the law does not so provide, either directly or indirectly; and the same thing may be said with regard to claims against corporations for which receivers are appointed. Suits against them are not prohibited, nor is the judge who appoints the receiver authorized to prohibit them; nor, yet, does the property of the corporation vest in the creditors, though the receiver, like the administrator of the estate of a deceased person, may, in a sense, be regarded as a trustee who holds such property for their benefit. The fact is that the law of this state, which authorizes the appointment of receivers, contains no provision upon the subject of suits against them at all, and, if we look elsewhere for information, we find that, nowhere, are suits against receivers prohibited, though, as a rule, permission to sue must be obtained from the court by which the receiver was appointed; and it appears to us that, in a receivership, the object of which is to wind up the estate of the corporation, it is as desirable that the creditors should be compelled to present their claims, promptly, as in the case of a succession, solvent or insolvent, and we can see no' good reason why such claims should not be prescribed if they fail to do so.
Counsel for opponents refer us to the case of Gaslight Co. v. Haynes, Liquidator, 7 La. Ann. 114, in which the court said:
“It is pleaded and argued that a portion of plaintiff’s claim is prescribed. The company represented by the defendant has been insolvent and in a state of insolvency for years. There seems, therefore, but little ground for considering any part of the claim prescribed, as suit could not properly be brought for the debt, but only steps taken to enforce a speedy liquidation of.the company by tableau of distribution.”
The concluding clause of the paragraph reads:
“This question will more properly arise on a tableau of distribution contradictorily with all the creditors of the corporation.”
And in C. & P. H. R. R. Co. v. Eason; 14 La. Ann. 820, the expression relied on by the learned counsel is, in terms, referred to as “obiter dictum.”
We are also referred to certain language used by the court in the case of Metropolitan Bank v. Brewing Co., 51 La. Ann. 1533, 26 South. 418, but that language was used with reference to an order, which was complained of, for the sale of mortgaged property, before the maturity of the debt, and cannot safely be wrested from its context and applied to a question of prescription, which is to be determined by specific provisions of law. In fact, so far as we have been able to discover, the immediate question here presented has not heretofore been decided in this state; the case affording the closest analogy .being that of Smith v. Palfrey, 28 La. Ann. 616, where it was said:
“Prescription runs against all persons, unless they are included in some exception established by law (Civ. Code, art 3521), and there is no *385 exception in favor of creditors of a succession, whether solvent or insolvent.”
[8] The remaining question is whether the deliveries to the banks of certificates of stock, in connection with the notes and drafts, are to be regarded as pledges, which operate as a continual acknowledgment of indebtedness, on the part of the company, thereby interrupting prescription. Conceding that, so long as the banks retained possession of any property pledged to them by the company to secure debts due by the latter, prescription was interrupted, because it was a standing acknowledgment of such debts (Citizens’ Bank v. Johnson, 21 La. Ann. 130); and conceding, further, that so long as the banks remained in possession, with the company’s consent, of any of its property, whether formally pledged or not, as a security for debts due by it, prescription does not run against the debts (Police Jury v. Duralde, 22 La. Ann. 109); conceding, we say, both those propositions, we find comparatively little opportunity to apply them in this case.
The note of $2,000, held by the Louisiana National Bank, bears upon its back the legend, “Secured by pledge of 40 shares of the Vossburg Mineral Spring Company Stock,” which, taken in connection with the oral testimony, sufficiently establishes the fact that there was a pledge of stock for that debt. Whether the stock belonged to Mordecai, or to the company, for which, and in the name of which, he negotiated the loan, is immaterial. It was pledged as the property of the company, and the company, as we have seen, made him whole with regard to any of his stock which he may have used for its benefit. And, in any event, neither the bank, which received the stock as the property of the company, nor Mordecai, who ' pledged it as such, nor the company, in whose behalf and by whose authority it was pledged, could be heard to deny, for the purposes of the transaction in question, that it belonged, and belongs, to the company, and there is no one else who can have anything to do with it.
As to the stock which was attached to the drafts, there was no semblance of a pledge. The company parted with the stock, as it did with the drafts, permanently. If the drafts had been paid, the stock would have become the property of the drawees. As they were not paid, they and the stock remained, and remain, assets of the banks. It cannot therefore be said that the banks have ever held in pledge any property of the company to secure the debts represented by the drafts, or have ever, with the consent of the company, held any such property in possession. We therefore conclude that the only instruments sued on by the banks upon which there can be recovery are the note and the three drafts, for $415, $600, and $540, maturing, respectively, August 10, 20. and 30,' 1904, and that, as to the rest, the plea of prescription of five years should be sustained.
[9] The learned counsel for Wilmot call attention to what purports to be a typewritten copy of the reasons assigned by the judge a quo for his judgment, from which it appears that he, at one time, thought of making his decree so read as to prohibit the receiver from paying out any of the money in his hands, until he shall have, first, sued for, and collected from the other stockholders, the “amounts due by them, in full of their pro rata to the debts due by the Vossburg Mineral Springs Company.”
If, however, our learned Brother ever entertained that idea, he abandoned it, and entered a decree “ordering the receiver to sue delinquent stockholder,” and further ordering :
“That the funds now in the hands of the receiver be distributed, so far as the same may go, among the creditors, in accordance with the account of said receiver, as amended by this *387 judgment; and that (if) there be, eventually, after payment of debts, any residue in the hands of the receiver, the same be distributed among the stockholders in proportion to their payments upon subscriptions, so as to equalize losses, so far as possible, among shareholders.”
We are of opinion that the decree, as to the matter under consideration, is correct. There is no reason why the creditors should await the result of the litigation against the delinquent stockholders for the distribution money that is on hand.
It is therefore ordered, adjudged, and decreed that, in so far as the judgment appealed from recognizes Charles Janvier and George W. Young liquidators of the Canal Bank & Trust Company (successor of the Provident Bank & Trust Company) as creditors of this receivership, and in so far as it recognizes Robert M. Walmsley, Sylvester P. Walmsley, and John F. Couret, liquidators of the Louisiana National Bank of New Orleans, as creditors of this receivership, save as hereinafter decreed, said judgment be annulled, avoided, and reversed.
It is further decreed that the claim of Charles Janvier and George W. Young, liquidators, be rejected and their opposition dismissed at their cost in both courts.
It is further decreed that there now be judgment in favor of the said Robert M. Walmsley, Sylvester P. Walmsley, and John F. Couret, liquidators, recognizing them as ordinary creditors of this receivership, and directing that they be placed on the account of the receiver, as such, in the sum of $3,555, with interest, at the rate of 8 per cent, per annum, on $2,000, from June 18, 1904, until paid, at the rate of 5 per cent, per annum, on $415, from August 10, 1904, on $600, from August 20, 1904, and on $540, from August 30, 1904, all, until paid, together with all costs of the district court.
It is further decreed that, in all other respects, the judgment appealed from be affirmed, and that the costs of the appeal be paid by the liquidators of said Canal Bank & Trust Company and said Louisiana National Bank, in equal proportions.
SOMMERVILLE, J., take0 no part herein.